UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: BEST VIEW CONSTRUCTION & DEVELOPMENT, LLC,<br><br>            Debtor and Appellant,<br><br>    v.<br><br>SHERMAN LEIBOW; SUSAN PERRY; and JOSIAH SILVA TRUST,<br><br>            Appellees. | Case No.: 1:21-cv-00413-MCE<br><br>**MEMORANDUM AND ORDER** |

Debtor and Appellant Best View Construction & Development, LLC ("Appellant" or "Debtor") appeals the Memorandum of Decision entered by the United States Bankruptcy Court for the District of Idaho, Case No. 20-00674-JMM. See Appellant's Brief, Dkt. 9 ("Appellant's Brief"); Appellant's Excerpts of Record, Dkt. No. 10 ("ER"). Having reviewed and considered the parties' briefings, the Court concludes that oral argument is unnecessary to resolve this appeal. For the reasons set forth below, the Court AFFIRMS the order of the Bankruptcy Court.

///

///

///

///

# BACKGROUND[1]

In 2019, Appellant was developing a tract of land which was to be divided into six separate lots with a quadplex to be constructed on each lot. Appellant found buyers for each of the lots and entered into a Pre-Sold New Construction Real Estate Purchase and Sale Agreement ("PSA") with each buyer. The three PSAs at issue here are the ones executed by Appellees Susan Perry ("Perry"), Sherman Leibow ("Leibow"), and the Josiah M. Silva Living Trust (the "Silva Trust") (collectively, "Appellees" or "Creditors"), respectively.[2] Ultimately, the project foundered, and before the quadplexes were completed, on July 22, 2020, Appellant filed a Chapter 11 bankruptcy petition. See ER 1–4; see also ER 572 (according to testimony, "on the date the bankruptcy petition was filed, Lot 2 was 50% completed; Lot 3 was 55% completed; Lot 4 was 60% completed; and Lot 6 was 65–70% completed."). On the same day, Appellant moved to reject a number of contracts, including the PSAs with each Appellee.[3] Those contracts were ultimately rejected. ER 159–60. Appellant subsequently completed the construction and sold all six lots in the development, including the lots at issue here, to an individual purchaser.

Appellees each filed a proof of claim and on October 20, 2020, Appellant objected to each of them, alleging, in part, that the method Appellees used to compute the unsecured portion of each claim was incorrect. ER 48–158, 161–72. Following an evidentiary hearing, on August 24, 2021, the bankruptcy court issued its Memorandum of Decision overruling, in part, Appellant's objections to the unsecured portions of

---

[1] The following facts are taken, sometimes verbatim, from the bankruptcy court's Memorandum of Decision. Given the parties' familiarity with the underlying facts of this case, the Court only recounts those details necessary to the resolution of the pending appeal. The Court ultimately refers to the factual background set forth in the Memorandum of Decision. See ER 570–82.

[2] Perry's PSA covered Lots 2 and 3, Leibow's PSA covered Lot 4, and the Silva Trust's PSA covered Lot 6.

[3] As explained in further detail below, the Bankruptcy Code permits a debtor to either assume or reject executory contracts upon entering bankruptcy.

2

Appellees' proofs of claim and ultimately applying Appellees' method of damages calculation.  See ER 569–611.  Appellant subsequently appealed.

## STANDARD

District courts review bankruptcy court decisions in the same manner as would the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit").  See In re George, 177 F.3d 885, 887 (9th Cir. 1999).  This Court has jurisdiction under 28 U.S.C. § 158(d) to review the bankruptcy court's determination of the measure of damages because it is a final decision disposing of a creditor's claim.  In re Rega Props., Ltd., 894 F.2d 1136, 1139 (9th Cir. 1990).  When reviewing an order resolving claim objections, legal issues involving statutory and contract interpretation are reviewed de novo, whereas factual issues are reviewed for clear error.  See In re Veal, 450 B.R. 897, 918 (B.A.P. 9th Cir. 2011).  "Determinations regarding the executory nature of the contract under [11 U.S.C. §] 365(g) and the effects of rejection pursuant to that section are conclusions of law which [are] review[ed] de novo."  In re Aslan, 909 F.2d 367, 370 (9th Cir. 1990).

## ANALYSIS

Section 365 of the Bankruptcy Code ("§ 365") provides that a debtor, "subject to the court's approval, may assume or reject any executory contract . . ."  11 U.S.C. § 365(a).  "A contract is executory if performance remains due to some extent on both sides."  Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1658 (2019) (citation and internal quotation marks omitted).  Upon entering bankruptcy, the debtor can either assume the contract, "fulfilling its obligations while benefitting from the counterparty's performance," or reject it, "repudiating any further performance of its duties."  Id.  Rejection of an executory contract constitutes a breach of such contract

1   "immediately before the date of the filing of the [bankruptcy] petition."  11 U.S.C.

2   § 365(g)(1).  "[T]he counterparty thus has a claim against the estate for damages

3   resulting from the debtor's nonperformance."  Mission Product, 139 S. Ct. at 1658.

4         At issue on appeal is whether the bankruptcy court applied "the proper method or

5   formula for calculating damages following a Chapter 11 debtor's rejection of an

6   executory contract."[4]  Appellant's Brief, at 9.  Specifically, the parties disagree over the

7   proper measure of damages in regard to the valuation of the partially constructed

8   quadplexes, as summarized by the bankruptcy court:

> In their submissions, Creditors claimed as damages the expected profit, which they calculated by taking the value of the improved lot—with the quadplex completed—and subtracting the purchase price as reflected in the PSA.  In contrast, Debtor believes the proper measure of damages is the difference between the purchase price and the fair market value of the property at the time of the breach, in this case, July 21, 2020.

ER 595–96.  In other words, Appellees argue that the damages should be calculated based on the "as-completed" value of the quadplexes whereas Appellant contends that it should be based on the "as-is" value of the quadplexes on July 21, 2020.  The bankruptcy court ultimately adopted Appellees' measure of damages, which is based on the Restatement (Second) of Contracts § 347 ("Restatement" or "§ 347").[5]

---

[4] Appellant previously raised before the bankruptcy court issues pertaining to the applicability of Idaho's Statute of Frauds and insufficient legal descriptions contained in certain contracts, but it is not pursuing these issues on appeal.  Appellant's Brief, at 7 n.2.

[5] Section 347, titled "Measure of Damages in General," provides:

> Subject to the limitations stated in §§ 350–53, the injured party has a right to damages based on his expectation interest as measured by
> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
> (c) any cost or other loss that he has avoided by not having to perform.

Restatement (Second) of Contracts § 347 (Am. L. Inst. 1981).  One comment to § 347 further elaborates as follows:

> b. Loss in value.  The first element that must be estimated in attempting to fix a sum that will fairly represent the expectation interest is the loss in the

4

The measure of damages for breach of contract is "determined by applying state law as long as it is not inconsistent with federal bankruptcy policy." Rega, 894 F.2d at 1139. Here, Appellant argues that (1) the bankruptcy court did not use applicable Idaho law, and (2) the formula adopted by the bankruptcy court is inconsistent with federal bankruptcy policy. See Appellant's Brief, at 19–27. The Court will address each argument in turn.

### A.   Idaho Law

Appellant first contends that, "[r]ather than follow the well-established Idaho measure of damages, the Bankruptcy Court chose instead to search out the Restatement of Contracts . . . without any reliance on or citation to Idaho law demonstrating that the Restatement rule applied or had been adopted as the law in Idaho . . ." Appellant's Brief, at 21–22. In "look[ing] to Idaho law for the proper measure of damages in this case," the bankruptcy court noted that "Idaho courts have generally gone in two directions, one way cited by Debtor [known as the traditional measure of damages] and the other championed by the Creditors." ER 596. Appellant, however, argues that the bankruptcy court's decision to apply the Restatement is not based on Idaho law and that Idaho courts have continually applied the traditional measure of damages. See Appellant's Brief, at 21.

In support, Appellant cites multiple cases in which the Idaho Supreme Court held that "the measure of damages for breach of contract involving the sale of realty is the difference between the contract price and the market value of the property at the time of

---

value to the injured party of the other party's performance that is caused by the failure of, or deficiency in, that performance.  If no performance is rendered, the loss in value caused by the breach is equal to the value that the performance would have had to the injured party.  If defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered.  In principle, this requires a determination of the values of those performances to the injured party himself and not their values to some hypothetical reasonable person or on some market. . . .

Id. § 347 cmt. b (internal citations omitted).

5

the breach, unless the parties specifically stipulated otherwise in the contract." Id. at 17 (citing Margaret H. Wayne Trust v. Lipsky, 123 Idaho 253, 261 (1993); Melton v. Amar, 83 Idaho 99, 107 (1961); Smith v. King, 100 Idaho 331, 335 (1979); State ex rel. Robins v. Clinger, 72 Idaho 222, 230 (1951)). While recognizing this "long line of case law," the bankruptcy court nonetheless distinguished those authorities because they all involved breaches by the purchaser, not the seller:

> In this case, the purchaser is not the breaching party. In the Court's view, this fact makes it difficult to employ the traditional measure of damages. When it is a purchaser who breaches, the seller retains the property to market to another buyer. As such, utilizing the difference between the contract price agreed to between the parties and the market value of the property at time of breach, makes sense.
>
> Employing this same damage calculation when it is the seller who breaches does not provide the same understandable result. If a buyer agrees to purchase property but the seller breaches the agreement, the market value of the property at time of breach is of little consequence, since that particular property is no longer in play, as least as regards that buyer. Rather, the buyer must go find another property to purchase. Here, not only is the seller the breaching party, but the building itself was only partially constructed at the time of the breach. Under those circumstances, the market value of those partially-constructed buildings is of little relevance to the Creditors here, who must begin the process anew.

ER 597–98 (citing Lipsky, 123 Idaho at 261 (stating that "the usual measure of actual damages for a purchaser's breach of contract for sale of realty is the difference between the contract price and the market value of the property at time of breach") (emphasis added)).

Appellant also relies on Ninth Circuit decisions in which the traditional measure of damages was applied in cases where the seller breached the contract. See Appellant's Brief, at 16–17, 21 (citing Aslan, 909 F.2d at 368; In re Chi-Feng Huang, 23 B.R. 798, 803 (B.A.P. 9th Cir. 1982)). However, these cases "simply considered a contract for sale of real property as it existed, not as was the case here, which is for the construction of a four unit apartment complex upon the subject lots." Perry and Leibow's Brief, Dkt. 11,

///

6

1   at 5; see also Aslan, 909 F.2d at 368 (involving sale of existing shopping arcade); Chi-

2   Feng, 23 B.R. at 799 (involving sale of existing apartment complex).

3          Lastly, Appellant argues that "the Idaho Supreme Court has not adopted the

4   provisions and comments in . . . § 347 in these types of cases" and thus "it does not

5   constitute Idaho law." Appellant's Reply Brief, Dkt. 15, at 11; see also Asbury Park, LLC

6   v. Greenbriar Estate Homeowner's Ass'n, Inc., 152 Idaho 338, 345 (2012) (stating that

7   the Restatement is not law unless it has been adopted by the Idaho Supreme Court).

8   Although there does not appear to be any Idaho Supreme Court decision expressly

9   adopting § 347,[6] that court has cited a former provision, Restatement (First) of Contracts

10  § 346 (Am. L. Inst. 1932), titled "Damages for Breach of a Construction Contract," with

11  approval.[7] See, e.g., Jensen v. Bledsoe, 100 Idaho 84, 90–91 (1979); Hafer v. Horn, 95

12  Idaho 621, 623 (1973). This is presumably what the bankruptcy court meant in saying

13  that "Idaho courts have generally gone in two directions . . ." ER 596. The bankruptcy

14  court discussed both provisions in its Memorandum of Decision, explaining that,

---

[6] According to Appellees, there are three Idaho court decisions that have cited § 347, only one of which was issued by Idaho Supreme Court, but even there, § 347 is only mentioned in a concurring opinion. See White v. Unigard Mut. Ins. Co., 112 Idaho 94, 102 (1986) (Bakes, J., concurring in part); Perry and Leibow's Brief, Dkt. 11, at 7–8 (also citing Sullivan v. Bullock, 124 Idaho 738, 744 (Idaho Ct. App. 1993); Gilbert v. Tony Russell Const., 115 Idaho 1035, 1038–39 (Idaho Ct. App. 1989)); Silva Trust's Brief, Dkt. 12, at 13 (same).

[7] Section 346 formerly provided, in part:

> (1) For a breach by one who has contracted to construct a specified product, the other party, can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, less such part of the contract price as has not been paid and is not still payable, determined as follows:
>
> (a) For defective or unfinished construction he can get judgment for either
>
> (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or
>
> (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff; if construction and completion in accordance with the contract would involve unreasonable economic waste.

Restatement (First) of Contracts § 346 (Am. L. Inst. 1932).

> In 1981, the treatise was amended and the section specific to construction contracts was omitted. In observance of this change, however, the notes were amended to provide, "The rules stated in former § 346, Damages for Breach of a Construction Contract, are presented as applications of the general rule on damages, and that section is omitted." RESTATEMENT (SECOND) OF CONTRACTS § 347 Reporter's note (Am. L. Inst. 1981).

ER 599–600. Because § 346 "was folded into comments on the application of the general rule of damages" and the "1981 comments indicate that this same distinction between whether a performance was rendered to the non-breaching party or no performance was rendered carries forward," Perry and Leibow's Brief, Dkt. 11, at 8, the substance of that former provision likely remains good law in Idaho. Therefore, the bankruptcy court did not apply non-existing Idaho law as Appellant contends.

The Court finds that the bankruptcy court did not fail to apply established Idaho law and agrees with the bankruptcy court's reasoning in using the measure of damages set forth in § 347:

> Here Debtor's partial performance followed by rejection of the contracts result in Creditors walking away with no portion of the quadplexes they contracted for. In other words, the facts are tantamount to Debtor having rendered no performance whatsoever to the Creditors. Under the Restatement, the measure of damages in that case would be the value that the Debtor's performance would have had netted to the Creditors. Viewed another way, Debtor rendered a partial performance where the value of the performance actually received is zero, which results in the same damage calculation. Following Debtor's rejection of the contracts, Debtor retains both the lots and the partially-constructed buildings, while the Creditors reap no benefit from Debtor's efforts. In this scenario, the proper measure of damages is the difference between the value of the finished quadplex contracted for, less the agreed-on purchase price, less the value of the performance that has been received by each Creditor. Because the deal is off and the Creditors will walk away with no buildings, the value of the performance received is zero. As such, the valuation at issue is not of the market value of the quadplexes in their partially-constructed state, but rather the value of the buildings as if they had been completed.

///

///

ER 601–02.  The analysis does not end here, for the Court must now consider whether the measure of damages applied by the bankruptcy court is consistent with federal bankruptcy policy.

### B. Federal Bankruptcy Policy

Assuming the correct Idaho law for calculating damages was applied, Appellant nevertheless argues that the bankruptcy court "failed to determine if the law it chose to apply was consistent with federal bankruptcy policy."  Appellant's Brief, at 20.  Specifically, Appellant contends that by utilizing the "as-completed" value in calculating Appellees' damages, the bankruptcy court ignored the well-established recognition by federal courts that "the purpose of Section 365 [of the Bankruptcy Code] is to make the debtor's rehabilitation more likely."  Id. at 24–25.  Had the bankruptcy court instead applied the "as-is" value of the lots on the date immediately before the bankruptcy petition was filed, "the maximum unsecured claim for each of the Creditors would be $0.00[,]" and thus Appellant would have been placed in a "better position to reorganize, which is the purpose of the applicable provisions of the Bankruptcy Code."  See id. at 18–19, 25.  However, "it is not contemplated within federal bankruptcy policy to simply disregard established rules of expectation damages so the debtor can have a more effective reorganization."  Perry and Leibow's Brief, Dkt. 11, at 14.  The Supreme Court explains as follows:

> The [Bankruptcy] Code of course aims to make reorganizations possible.  But it does not permit anything and everything that might advance that goal.  See, e.g., Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U. S. 33, 51, 128 S. Ct. 2326, 171 L. Ed. 2d 203 (2008) (observing that in enacting Chapter 11, Congress did not have "a single purpose," but "str[uck] a balance" among multiple competing interests (internal quotation marks omitted)).  Here, Section 365 provides a debtor . . . with a powerful tool:  Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return.  See supra, at 1658–1659.  But in allowing rejection of those contractual duties, Section 365 does not grant the debtor an exemption from all the burdens that generally applicable law—whether involving contracts or trademarks— imposes on property owners.  See 28 U.S.C. § 959(b) (requiring a trustee to manage the estate in accordance

> with applicable law).  Nor does Section 365 relieve the debtor of the need, against the backdrop of that law, to make economic decisions about preserving the estate's value—such as whether to invest the resources needed to maintain a trademark.  In thus delineating the burdens that a debtor may and may not escape, Congress also weighed (among other things) the legitimate interests and expectations of the debtor's counterparties.  The resulting balance may indeed impede some reorganizations, of trademark licensors and others. But that is only to say that Section 365's edict that rejection is breach expresses a more complex set of aims than [the debtor] acknowledges.

Mission Product, 139 S. Ct. at 1665–66.[8]

Here, by rejecting the PSAs, Appellant was relieved of the obligation to complete construction of the quadplexes and deliver them upon completion to Appellees, which makes its rehabilitation more likely and puts it in a better position to reorganize.  See Appellant's Brief, at 24–25.  Following Appellant's rejection of the PSAs, Appellees have "a claim against the estate for damages resulting from the debtor's nonperformance . . . . [b]ut such a claim is unlikely to ever be paid in full."  Mission Product, 139 S. Ct. at 1658. The bankruptcy court recognized this in reaching its decision:

> The Court is mindful that the value of the fully-constructed quadplex is not equal to the value the Creditors would have received had the deals been fully realized and completed. Practically speaking, each Creditor would have had quadplexes to rent in what is currently a landlord's market.

ER 602 n.11; see also Mission Product, 139 S. Ct. at 1658 (stating that unsecured creditors "in a typical bankruptcy may receive only cents on the dollar").

Nevertheless, Appellant argues that awarding damages based on the "as-completed" value is inconsistent with Ninth Circuit precedent.  See Appellant's Brief, at 24–26. Appellant relies on the Ninth Circuit's decision in Rega, where the court explained that "allowing rejection of an executory contract under section 365 is to make the debtor's rehabilitation more likely," and that it serves two purposes:  "It relieves the debtor of burdensome future obligations while he is trying to recover financially and it

---

[8] Mission Product considered a trademark licensing agreement, see 139 S. Ct. at 1657, but its discussion of § 365 in relation to rejection of executory contracts generally is applicable here.

10

constitutes a breach of a contract which permits the other party to file a creditor's claim." 894 F.2d at 1140 (citations omitted).  Given these purposes, the court in Rega found that, similar to specific performance, "allowing recovery of the contract price would also undercut the purpose of rejection under section 365."  See id. at 1140–41 ("[I]f the Court were to accept the argument . . . that [the creditors] were entitled to the balance due on the contract, presumptively in cash, what point would there be to a rejection of an executory contract under 11 U.S.C. § 365?").  The bankruptcy court addressed Rega in its Memorandum of Decision and took "no issue with the statement regarding the purpose of rejection of executory contracts in bankruptcy," but ultimately concluded that

> the facts of Rega are sufficiently distinguishable from those presented here to compel use of a different measure of damages.  In Rega, the party from whom the debtor was purchasing real property breached a separate contract for which the property was pledged as collateral.  The third-party foreclosed and the subject property was lost.  When the debtor filed a bankruptcy petition, it rejected the contract and therefore breached it, and the creditor who had lost the property to foreclosure filed a proof of claim and sued for damages.
>
> Under those facts, allowing the creditor to receive the unpaid portion of the purchase price would serve no purpose.  After all, the property had been foreclosed through no fault of the debtor, who could no longer gain the benefit of the contract.  Relevant here, the Rega decision observed that the difference between the unpaid balance of the principal and the market value of the property at the time of the breach presupposes that the nonbreaching party will be able to realize the property's market value by subsequently selling the property to another purchaser.  [Rega, 894 F.2d] at 1140.  Such are not the facts presented here.

ER 598–99.  The Court agrees with this distinction and finds Rega inapplicable to the facts of this case.  Because rejection "still preserves for the creditor that right to have an unsecured claim based on the damages suffered from the contractual breach," the bankruptcy court's decision to award damages based on the "as-completed" value in this case aligns with federal bankruptcy policy.  See Silva Trust's Brief, Dkt. 12, at 17.  In sum, the bankruptcy court's decision is not inconsistent with state law or federal bankruptcy policy and thus that decision is AFFIRMED.

**CONCLUSION**

For the foregoing reasons, the Memorandum of Decision entered by the bankruptcy court is AFFIRMED.  This appeal is hereby DISMISSED, and the clerk is directed to close the file.

IT IS SO ORDERED.

DATED:  January 30, 2023

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE